IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KASIE DUCHARME, DECEASED, BY AND
THROUGH DANA ROGERS, SPECIAL
ADMINISTRATOR, ET. AL.,

        Plaintiffs,


        vs.                       Case No. 09-2338-JTM


THE BOARD OF COUNTY COMMISSIONERS OF
BUTLER COUNTY, KANSAS, ET. AL.,

        Defendants.


## MEMORANDUM AND ORDER

The following motions are before the court: Defendant El Dorado Internal Medicine, L.L.C.'s Motion for Summary Judgment on Plaintiffs' Claim for Punitive Damages (Dkt. No. 130); defendants Board of County Commissioners of Butler County, Kansas and Sheriff Craig Murphy's Motion for Summary Judgment (Dkt. No. 133); and defendants Aaron Hall, Michael Schmidt, and Steve Hamilton's Motion for Summary Judgment (Dkt. No. 135). The present matter involves issues surrounding the tragic death of Kasie Ducharme. The detailed facts are set out below. The court held oral argument on the motions on May 25, 2011, and took the motions under advisement. For the following reasons, the court grants the motions. Nevertheless, the court denies defendants' request to dismiss plaintiffs' remaining state law claims.

**I. Findings of Fact and Procedural Background**

*A. June 21st Through June 25: Ducharme's Incarceration and Death*

Augusta police officers arrested Kasie Ducharme for an outstanding probation violation on June 21, 2007, at around 1:40 p.m., and transported her to the Butler County jail in El Dorado, Kansas. Ducharme slept during the ride and did not complain about any medical problems. Upon arriving she went to the booking area of the jail and stayed there for the rest of the day.

The Butler Count jail contracted with El Dorado Internal Medicine, LLC, (EIM) to provide medical care to inmates beginning in 2003, and all times pertinent to this matter. Dr. H. Richard Kuhns was the medical director for the jail clinic during the relevant time period and Tamara Harper was the Health Services Administrator. Harper is an Advanced Registered Nurse Practitioner. Marla Park is a Certified Nursing Assistant and Certified Medication Aide who also worked at the clinic. Defendants Aaron Hall, Michael Schmidt, and Steve Hamilton were all deputies at the Butler County jail in the women's dorm during this time period.

The Butler County jail was built in 2003, and contained four "pods," one of which was built to house female inmates. Each pod has a central location where a corporal sits so she can oversee the entire pod. Separate from each pod, the jail contains a "central control center" which serves as a dispatch center for the entire jail. The deputy stationed there is responsible for opening and closing doors in the jail and monitors people throughout the jail with cameras. In order to maximize space for male inmates, all four pods contain male inmates and the females are housed in the area originally designed to house the work release inmates. The women's dormitory does not have a central location where a corporal can oversee the entire dorm.

2

On June 22, the day after arriving at the jail, Ducharme complained to Lt. Smith that she had right hip pain. Hall examined her and asked what happened to her hip, but Ducharme did not remember. Hall noted Ducharme was alert and oriented, her respirations were regular and unlabored, and her heart rate was normal. There were no visible signs of swelling, discoloration, or malformations of the right hip. Hall palpated her right hip and she did not complain or grimace. Hall further noted Ducharme had "[d]rug track marks bilateral in antecubatal spaces," and "[p]upils pinpoint." She also questioned her on drug use and Ducharme told Hall, "I use a gram of meth a day." (Dkt. No. 132, Ex. D., pg. 10). During this visit, Hall also gave Ducharme an inmate handbook providing information on how to request medical attention.

Ducharme next requested medical treatment on June 24. At 3:34 a.m., detention officer Dana Burns sent Harper an email stating:

> Ducharme #2520 In complaining of pain from her right knee up to her right hip. Her right knee is double the size of her left knee. No bruising that I can see, pulses are good in her foot and she was able to apply pressure to my hand and pulls against my hand with her foot. She stated she was seen by a nurse when she was booked in on the 21st.

(Dkt. No. 132, Ex. D., pg. 11). At around 9:30 a.m., Jean Valentine, LPN, examined Ducharme. Ducharme complained of pain and swelling in her right leg and not being able to sleep. Valentine noted her leg and knee were swollen above the patella with no gross deformity or bruising and Ducharme indicated generalized pain upon palpation. Her skin was warm, dry, and pale. Valentine wrapped her knee, gave her six packets of Motrin for pain, and instructions on rest and how to use the ice packs.

Defendant Aaron Hall began his supervisory shift at the women's dormitory on June 24, at 6:00 p.m. He recalls Ducharme limping and complaining about leg pain. At 10:00 p.m., Ducharme

requested medical treatment, and Hall gave her a medical request form. Shortly thereafter, Ducharme again requested medical treatment and Hall again told her to fill out the medical request form. Ducharme completed the request form around 11:00 p.m. stating, in part:

> What treatment are you requesting? My leg is broke. I need to go to the hospital now I can't take the pain any more it's hurting my chest now. Please thanks, Kasie.
> What time and day did the injury or illness begin? Day I got arrested.

(Dkt. No. 133, Ex. D., pg. 8). Hall's supervisor, Corporal Lovette, escorted Ducharme to the jail medical clinic where she was examined by Park. Initially she complained of chest pain and stated that her leg was broken. Park asked her why she was in medical and she stated, "I need to go to the hospital, I can't breathe, my leg is broken, I want to stay in here, it's cool, my chest hurts, you need to give me something for the pain, or take me to the hospital." (Dkt. No. 132, Ex. D, pg. 7). However, she talked without distress and did not stop to take a breath. Ducharme further expressed her desire for medication because "there were lots of other women in the dorm that get all kinds of meds, and their leg isn't hurting them and I want what they're getting." (*Id.*). Park explained to her that she could not just get any medicine she wanted. Ducharme then said "my leg is causing my chest to ache." (*Id.*). Park asked if her chest was hurting and she said no. Park notified Harper, and they gave Ducharme 6 packets of Ibuprofen and an ice pack. Last, Ducharme asked for a wheelchair to use in court the next day and that request was refused. During this visit her blood pressure was 110/72, a pulse of 72, and a temperature of 97.3. Deputy Fowler escorted her back to the women's dorm. Ducharme visited Hall several times during the remainder of his shift complaining of leg and chest pain.

Defendant Michael Schmidt came on duty in the women's dorm at 6:00 a.m.[1] on June 25, 2007. Early in his shift, Ducharme requested a bunk closer to the bathroom, and she moved there. Around 8:40 a.m., Ducharme asked Schmidt for another ice pack. He spoke to the medical staff and informed Ducharme she would get one at the next medication pass.

Unable to walk to the clinic, Schmidt got Ducharme a wheelchair at 9:30 a.m. and she went to the clinic where she was examined by Harper. Harper described her as a "[d]ifficult historian—vague description of history and events surrounding injury. Unable to recall full details of past medical history or providers." (Dkt. No. 132, Ex. D., pg. 5). Ducharme told Harper she fell while running up concrete steps chasing her children. She said the pain was ok with Ibuprofen and Tylenol but is severe enough at times that she cannot get out of bed. Ducharme also reported intermittent left lower rib/chest wall pain that increased with deep inspiration but was uncertain when those symptoms began. When asked about her previous pharmacological history, she stated she had been on oxycontin for eights years but her personal doctor stopped writing proscriptions after he found out she was using illegal drugs. She also indicated using one gram of methamphetamine per day as well as Xanax, Clonopin, Valium, and Seroquel. Her vitals at the time were: blood pressure, 112/78, pulse 82, and a temperature of 98. Harper noted no contusions or other obvious injuries to the chest wall. Her abdomen was soft, and she had normal bowel sounds. There was minimal swelling and a faint bruise about two inches above her right knee. Her right thigh and hip was generally tender. Harper proscribed one Ibuprofen 800mg, three times a day, Ultram 50mg three

[1]On June 25, 2007, Schmidt was on a "period of reckoning" for misconduct after obtaining a female inmate's phone number about ten months before Ducharme's death. He was suspended for three days and placed on probation.

times a day, and Tylenol every four hours as needed. Harper told her to use ice three times a day and to elevate her leg when in bed. Harper also ordered x-rays of her right knee and hip and told her not to put weight on her right side until the results of the x-rays came back. Around 3:00 p.m., the results came back negative. Ducharme returned to the women's dorm at 10:11 a.m. and immediately went to the booking area. Before noon, she returned to the women's dorm with Deputy Geltz and ate her lunch at her bunk.

After lunch, Ducharme left for a court hearing in a wheelchair. Judge Ricke was notified that Ducharme was in a wheelchair and throwing up in the back room. Ducharme told Judge Ricke, "I need to go get help from EMS and they won't take me over there." (Dkt. No. 140, Ex. H, pg. 7). Further, Ducharme said "they're being so mean and I asked to go to EMS and they won't take me 'cause they said they were low staff.'" (Dkt. No. 140, Ex. H, pg. 7). Judge Ricke directed the court staff to send written communication to the jail and for medical staff to evaluate her to make sure she was receiving adequate medical care. It is clear this message was relayed to some of the deputies at the jail, but the parties dispute whether the medical staff was notified.

Upon returning, she walked to the bathroom from her bunk without a wheelchair. Schmidt then called his supervisor and asked if he could allow Ducharme to continue to use the wheelchair after he had seen her walk on her own. With permission, Schmidt took the wheelchair away from her. Around 4:00 p.m., Schmidt took all the inmates except Ducharme to the recreation yard. Ducharme ate her dinner at her bunk with the assistance of Corporal Brown. Deputy Chad Archer relieved Schmidt from his shift at about 5:18 p.m. Before he left, Ducharme fell while walking to the restroom. April Blackburn and Amy Cain-Sudderth, inmates, testified that Schmidt laughed and told everyone not to help her up and that if she could not get up on her own she could "piss herself."

Ducharme fell several times that day. Several inmates told Schmidt they were concerned about Ducharme's condition and that they believed she was going to die on his shift. Throughout Schmidt's shift he indicated he believed Ducharme was "faking," and made jokes about her medical condition.

At around 6:00 p.m. on June 25, Deputy Hamilton came on duty as Ducharme was leaving the restroom. She fell over in what he believed was a "fake fall." Deputy Archer told Hamilton to call his supervisor to determine what to do. Hamilton called Sergeant Jackson and told him Ducharme had fallen in the dorm and was unable to walk back to her bunk. Hamilton said she was fine, but that she said her head hurt. According to Sergeant Jackson, he informed Park immediately after the incident but Park said she had seen Ducharme twice that day and that she was fine. However, Park did promise to contact Harper. Around 6:30 p.m., two inmates asked Hamilton if they could help Ducharme take a shower because she was complaining of being cold. Two inmates placed Ducharme on a bed mat and drug her to the shower and bathed her. Ducharme could not hold her head up and needed help showering. She returned to her bunk at 7:00 p.m. Twenty minutes later, Ducharme fell out of her bunk, and Hamilton helped her back up. Blackburn testified Ducharme was pleading with Hamilton telling him, "please, I need to see somebody. I really need to see somebody. They're not doing anything for me. I think I am dying." (Dkt. No. 145, Ex. B., pg. 46-47). Sometime before 8:00 p.m., Hamilton contacted Sergeant Jackson, who was in the medical clinic, and notified him of Ducharme's condition stating he believed she needed follow-up care. Jackson relayed this message to Park who again said she would contact Harper. Shortly thereafter, Hamilton called his supervisor or the medical staff again and reported Ducharme's legs and fingers were turning colors. A few minutes later he called Park, who advised him to escort Ducharme to the clinic. From about 7:45 p.m. to 8:33 p.m., Ducharme was not seen by any medical staff. During this period of time,

Blackburn testified that Ducharme's skin was numb, and that her skin was cold, clammy, and a pale yellow color. Ducharme pleaded with Hamilton that she needed medical help and expressed fears that she was dying. Other inmates cursed Ducharme and accused her of faking, but, according to Blackburn, it was clear she was not faking.

At 8:03 p.m, Park paged Harper at her home and informed her Ducharme was complaining of increased pain and that her hands were purple, blotchy, and she was yellow in color. Harper left her house and arrived at the jail at 8:30 p.m. While waiting for Ducharme, Amy Cain, an inmate, informed Harper she had helped Ducharme shower earlier in the day because Ducharme had trouble standing. A jail deputy then notified Harper that Ducharme had fallen from the wheelchair and was lying on the floor in the doorway of the women's dorm. Harper arrived at the women's dorm and saw Ducharme lying supine on the floor, she was pale and dry. Her feet were blotchy and her oral membranes were dry. Her pulse was 80. Several other inmates told Harper Ducharme was "shooting Dilaudid" and methamaphetamine and that she was walking on her own at times that day. After yelling at her to get up, Harper assisted Ducharme to a sitting position and Corporal Torres transported her to the clinic in a wheelchair. In the exam room, Ducharme appeared weak and moaned in response to questions. As Harper lifted Ducharme to help her onto the bed, Ducharme became unresponsive with agonal respirations and no noticeable pulse. Harper yelled at her to get up, then moved her to the floor and began CPR. EMS was notified. EMS applied an Automated Eternal Defibrillator to her and resuscitation efforts continued. EMS then transported Ducharme to the emergency room at Susan B. Allen Memorial Hospital, where Dr. Rundell and the emergency room staff assumed care until all resuscitation efforts ceased. An autopsy determined that Ducharme died of methicillin resistant Staphylcoccus aureus (MRSA) sepsis and pneumonia on Monday June

25, 2007, at 9:44 p.m. Harper was surprised by the cause of death and never considered it necessary to have Dr. Kuhns consulted.

EIM's expert, Dr. David McKinsey, an infectious disease doctor, has reviewed the medical reports and other information surrounding Ducharme's death. The following portions of his testimony are pertinent to this motion.

First, Dr. McKinsey states that Park deviated from the standard of care during Ducharme's visit to medical on the evening of June 24, because she did not instruct Ducharme to return immediately if her chest pain recurred and for not sending her to the emergency room for evaluation of the chest pain. He also testified that after examining Park's notes, it does not appear she recognized Ducharme had a life-threatening condition.

At Ducharme's 9:30 appointment on June 25, Dr. McKinsey testified Harper deviated from the standard of care because she did not order a chest x-ray, send Ducharme to the emergency room for evaluation of pleuritic chest pain, or characterize the right lower leg swelling. Dr. McKinsey also testified that he believes Harper did not recognize Ducharme had a life-threatening condition. After Ducharme fell at 6:00 p.m. and Park was informed, Dr. McKinsey states Park again deviated from the standard of care by failing personally to evaluate Ducharme's declining condition. Finally, Dr. McKinsey evaluated Park's phone call to Harper at 8:03 p.m. and Harper's subsequent response. First, Dr. McKinsey believes Harper should have called EMS immediately after receiving the 8:03 phone call. Second, he believes she also deviated from the standard of care by failing to call EMS when she saw Ducharme at the jail. He also stated Harper should have recognized that Ducharme was seriously ill, even though she likely never realized Ducharme was dying. And certainly never realized she was dying from septic shock caused by MRSA.

Furthermore, he testified that Ducharme was obviously acutely ill throughout the day on June 25, 2007, and that she had no less than a fifty percent chance of survival 22 hours before her death and that her likelihood of survival diminished rapidly after 8:00 p.m. on June 25. However, he testified she had a reasonable shot at survival as late as 8:30 p.m.

*B. Butler County Jail's Policies and Procedures Regarding Medical Services and Deputy Training*

Under the medical services agreement between the Board of County Commissioners of Butler County and EIM, "all medical care providers provided by EIM pursuant to the terms of this agreement are employees of EIM and not employees of the County." (Dkt. No. 134, Ex. 3, pg. 1). Regarding the scope of medical services provided, the agreement stated:

> EIM shall provide a comprehensive health care service to include the staffing of the medical facility at the Detention Center by licensed health care professionals and/or nursing personnel 16 hours per day, 5 days per week. In addition, EIM will provide on site medical services each weekend for a minimum of 8 hours per weekend. In addition, EIM medical staff shall be available on a 24-hour per day, 7 day per week basis "on-call" basis to address any emergent situation that may arise.
> All medical care shall be under the direct supervision of Dr. Richard Kuhns, who will serve as the medical director for the facility. In Dr. Kuhn's absence, other EIM physicians will provide the coverage needed to insure that a licensed primary care physician is available at all times to direct the operations of the medical facility, supervise the EIM medical personnel provided, and be available for medical treatment as needed.

(Dkt. No. 134, Ex. 3, pgs. 2-3).

Defendant Craig Murphy is the Sheriff of Butler County and is responsible for the general operation of the Butler County jail. *See* KAN. STAT. ANN. §§ 19-811 (2010) ("The sheriff shall have the charge and custody of the jail of his county, and all the prisoners in the same, and shall keep such jail himself, or by his deputy or jailer, for whose acts he and his sureties shall be liable."); 19-1903

(2010) ("The sheriff of the county by himself or deputy shall keep the jail, and shall be responsible for the manner in which the same is kept."). He did not have any personal involvement in Ducharme's medical care while she was in the jail and was not aware of her medical complaints or treatment until after her death. However, Sheriff Murphy had established written policies and procedures relating to inmate medical care to guide the conduct of his detention deputies during the relevant time period.

Jail Policy No. 117, the general medical policy in effect during June 2007, provided that, unless emergency medical treatment was needed, an inmate must complete a medical request form and the medical clinic would schedule an appointment for the inmate. If emergency treatment was needed, the clinic was to be notified immediately and medical staff on duty would determine the appropriate action. Policy No. 106.06, regarding medical emergencies, required deputies to report emergencies to Central Control and to render medical assistance to the inmate if possible. Central Control would "signal medical" over the radio and call 911 if directed by the shift supervisor. The medical staff would also be notified. Policy No. 117.04 provided general guidelines on preventing the spread of communicable and infectious diseases.

Jail Policy No. 101.03 provided the policy for detention personnel training. Prior to June 2007, Harper provided initial and annual training to detention deputies regarding various medical topics at the request of jail supervisors. She provided about eight hours of instruction including, basic first aid, CPR, medical procedures, submitting sick call requests, blood-born pathogens, infectious diseases, and suicide prevention. The training also included general instructions on MRSA respecting its prevalence and spread; however, it was not sufficient to train deputies on diagnosing MRSA. She also trained the deputies in recognition of medical emergencies such as, traumas, falls,

head injuries, diabetes, shortness of breath, chest pains, sinus symptom recognition, and symptoms of illness. Harper described the overall gist of the training as:

> What was the kind of all-encompassing theme to all of it was—that I stressed a lot was that, you know, if—this is speaking to the detention staff, you know, it's not your place to diagnose and decide what is wrong. What I need you to do is recognize that something's not right and that if this was your friend or family member and that you had a concern about them that you would want them to see a doctor or talk to a nurse about that then you would pass that information on to the medical staff so that then we would have an opportunity to assess it and then go take it from there.

(Dkt. No. 134, Ex. 2, pg. 112).

Defendants Hall, Schmidt, and Hamilton all personally received training. Hall successfully completed a ten-week field training program in September 2003. He ceased working for the jail in April 2005, but returned in September 2006. Upon returning, he was given a training manual on the jail's policies and procedures. He completed another ten-week field training program, which included working in the women's dorm. Specifically, he was tested on sick-call policies and what to do if an inmate complains of chest pain. He also completed a test on March 20, 2007, which contained questions on chest pain, blood-born pathogens, and the spread of infectious diseases. Schmidt began working for the Butler County Jail in December 2005, and successfully completed a two-month field training program. He was also given a training manual of the jail's policies and procedures. Like Hall, he completed two exams and received training covering chest pain, CPR, blood-born pathogens, and the prevention of infectious diseases, among other things. Hamilton began his employment in April 2007. He received a week of classroom training and about four weeks of field training. On May 24, he finished his final field training exam including questions on recognizing conditions requiring immediate medical attention. He also received a 2007 field training manual and executed written acknowledgment that he read its policies and procedures.

*C. Procedural History*

Dana Rogers, the special administrator appointed for Ducharme filed suit on June 22, 2009. She subsequently filed an Amended Complaint (Dkt. 40) on January 13, 2010, alleging the following causes of action against the several defendants: Count I, 42 U.S.C. § 1983 violations of the United States and Kansas Constitutions against the Board of County Commissioners for Butler County, Sheriff Murphy, Hamilton, Hall, and Schmidt;[2] Count II, wrongful death against all defendants; Count III, survival for personal injuries against all defendants; and Count IV a negligence claim against all defendants. Defendants have filed summary judgment motions that are now pending before the court.

## II. Legal Standard: Summary Judgment

Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hosp.*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Nat. Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th

---

[2]The Amended Complaint also contained § 1983 claims against El Dorado Internal Medicine, LLC, but plaintiffs later withdrew those claims. (Dkt. No. 111).

Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Id.* Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Id.* at 587 (quoting Fed. R. Civ. P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

### III. Conclusions of Law

*A. Defendant El Dorado Internal Medicine, L.L.C.'s Motion for Summary Judgment on Plaintiffs' Claim for Punitive Damages*

1. Punitive Damages in Kansas

EIM moves for summary judgment on plaintiffs' request for punitive damages arguing there is no clear and convincing evidence that Harper or Park realized Ducharme had MRSA, sepsis, or pneumonia or any life threatening condition and consciously refused her appropriate medical care.

Under Kan. Stat. Ann. § 60-3702(c), "[i]n any civil action where claims for exemplary or

punitive damages are included, the plaintiff shall have the burden of proving by clear and convincing[3] evidence in the initial phase of the trial, that the defendant acted toward plaintiff with willful conduct, wanton conduct, fraud, or malice." *Id.*; *see also Reeves v. Carlson*, 266 Kan. 310, 313, 969 P.2d 252, 255 (1998) (quoting Kan. Stat. Ann. 60-3702(c)).[4] Punitive damages are imposed as a way to punish the malicious, wanton, vindictive, or willful acts of others and to deter others from committing similar wrongs. They are not allowed because of any special merit to the injured party's case or because of the tragic facts surrounding an unfortunate occurrence. *See Sullwold v. Barcus*, 17 Kan. App.2d 410, 413, 838 P.2d 908, 910 (1992).

"Wanton conduct is (1) an act performed with a realization of the imminence of danger and (2) a reckless disregard or complete indifference to the probable consequences of the act." *Reeves*, 266 Kan. at 313, 969 P.2d at 256 (alterations added). A wanton act is more than a negligent act, but less than a willful one. *Id.* at 314, 969 P.2d at 256. "Unlike negligence, '[w]anton conduct is established by the mental attitude of the wrongdoer rather than by . . . particular negligent acts.'" *Wagner v. Live Nation Motor Sports, Inc.*, 586 F.3d 1237, 1244 (10th Cir. 2009) (applying Kansas law) (quoting *Robison v. State*, 30 Kan. App.2d 476, 43 P.3d 821, 824 (2002)). The essence of a finding of wantonness is the "'knowledge of a dangerous condition and indifference to the

---

[3]"Evidence is clear and convincing if it shows that the truth of the fact asserted is highly probable." PIK-Civil 4th 171.44.

[4]Kan. Stat. Ann. § 60-3702(a) creates a two-step procedure for recovering punitive damages which provides:
> In any civil action in which exemplary or punitive damages are recoverable, the trier of fact shall determine, concurrent with all other issues presented, whether such damages shall be allowed. If such damages are allowed, a separate proceeding shall be conducted by the court to determine the amount of such damages to be awarded.

*Id.* This district has held that such a bifurcated procedure, in which the court decides the amount of damages, violates the Seventh Amendment Right to A Jury Trial. *See Capital Solutions, L.L.C. v. Konica Minolta Bus. Solutions U.S.A., Inc.*, 695 F. Supp.2d 1149, 1155-56 (D. Kan. 2010).

consequences.'" *Id.* (quoting *Reeves*, 969 P.2d at 256). The plaintiff need not prove intent or a willfulness to injure. *Id.* "Because 'wantonness' derives from 'the mental attitude of the wrondoer[,] . . . acts of omission as well as acts of commission can be wanton.'" *Id.* (quoting *Gould v. Taco Bell*, 239 Kan. 564, 722 P.2d 511, 518 (1986)). "Finally, '[w]hether a defendant's conduct constitutes wantonness necessarily depends on the facts and circumstances of each case.'" *Id.* at 1246 (quoting *Wolfgang v. Mid-America Motorsports, Inc.*, 111 F.3d 1515, 1522 (10th Cir. 1997) (applying Kansas law).

The determination of whether conduct was wanton is usually a question of fact for the jury. *Gruhin v. City of Overland Park*, 17 Kan. App.2d 388, 392, 836 P.2d 1222 (1992). "Only when reasonable persons could not reach differing conclusions from the same evidence may the issue [of wantonness] be decided as a question of law." *Id.* "A claim for punitive damages 'survives a motion for summary judgment if a reasonable juror could find from the evidence that the defendant[ ] acted in a wanton manner by clear and convincing evidence.'" *P.S. ex. rel. Nelson v. The Farm, Inc.*, 658 F. Supp.2d 1281, 1303 n.14 (D. Kan. 2009) (quoting *Rios v. Bigler*, 847 F. Supp. 1538, 1548 (D. Kan. 1994)).

### 2. Recovering Punitive Damages Against an Employer or Principal

Although not addressed by the parties, plaintiffs' first obstacle in obtaining punitive damages from EIM lies in the restrictions placed in Kan. Stat. Ann. § 60-3701, subsections (c) and (d). Specifically, Kan. Stat. Ann. § 60-3701(d)(1) limits the availability of punitive damages against an employer or principal for the acts of its employee or agent:

(d) In no case shall exemplary or punitive damages be assessed pursuant to this

section against:

> (1) A principal or employer for the acts of an agent or employee unless the questioned conduct was *authorized or ratified* by a person expressly empowered to do so on behalf of the principal or employer; or
> (2) an association, partnership or corporation for the acts of a member, partner or shareholder unless such association, partnership or corporation *authorized or ratified* the questioned conduct.

KAN. STAT. ANN. § 60-3701(d)(1)-(2) (2010) (emphasis added). This statute expressly limits an employer's liability for punitive damages for its employees' conduct to situations in which the employer either *authorized or ratified* the employees' conduct. *Id.*; *see Smith v. Printup*, 254 Kan. 315, 336, 866 P.2d 985, 1000 (1993). Prior to the enactment of § 60-3701, an employer could be liable for punitive damages because of employees' torts committed during the course of employment in the following circumstances:

> "(a) a corporation or its managerial agent authorized the doing and manner of the act; (b) the employee was unfit and the corporation or its managerial agent was reckless in employing or retaining him; (c) the employee was employed in a managerial capacity and was acting within the scope of employment; or (d) the corporation or its managerial agent ratified or approved the act of the employee."

*Kline v. Multi-Media Cablevision, Inc.*, 233 Kan. 988, 994, 666 P.2d 711, 716 (1983). Thus, under prior law, an employer could be liable for punitive damages if "the employee was employed in a managerial capacity and was acting within the scope of employment." *Id.* Section 60-3701 changed that rule and specifically limited punitive liability to authorization and ratification situations. The Kansas Supreme Court has defined authorization and ratification as follows:

> [W]e hold that authorization under the provisions of K.S.A.1992 Supp. 60-3701(d)(1) may be either express or implied and generally is accomplished before or during the employee's questioned conduct. It may be based on an express grant of authority or on a course of conduct indicating that the employee was empowered or given the right or authority to engage in the questioned conduct. Ratification under the provisions of 60-3701(d)(1) may be either express or implied and may be accomplished before, during, or after the employee's questioned conduct. It may be

based on an express ratification or based on a course of conduct indicating the approval, sanctioning, or confirmation of the questioned conduct.

*Smith*, 254 Kan. at 342, 866 P.2d at 1003. The *Smith* court also defined "by a person expressly empowered to do so on behalf of the principal or employer." *Id.* at 342, 866 P.2d at 1004. This phrase "necessarily refers to a person provided with the express authority to act on behalf of and bind the principal or employer." *Id.* "For example, a managing agent of an employer or principal normally would possess the express power to bind the employer or principal. Thus, a managerial agent acting on behalf of the principal or employer could ratify or authorize an agent's or employee's questioned conduct within the meaning of those terms under 60-3701(d)(1)." *Id.*

Here, neither party addresses the issue of employer liability when arguing their respective positions on this summary judgment motion. The two employees whose actions form the foundation for punitive liability have been dismissed (Dkt. No. 66). Thus, plaintiffs are seeking punitive damages only on a vicarious liability theory. Because plaintiffs cannot show EIM either authorized or ratified Park or Harper's conduct, § 60-3701 prohibits awarding punitive damages to a plaintiff and against an employer based on the conduct of its employee.[5] Thus, it is unnecessary to analyze the merits of plaintiffs' punitive damages claim.

*B. Defendants Hall, Schmidt, and Hamilton's Motion for Summary Judgment (Dkt. No. 135)*

In this motion, defendants[6] argue plaintiffs cannot show Hall, Schmidt, or Hamilton delayed

---

[5] At the hearing, plaintiffs did make a weak argument that Harper authorized Park to refuse medical care to Ducharme after discovering the leg and knee x-rays were negative. The court does not find this argument persuasive and plaintiffs cannot make any serious contention that Harper had authority to authorize any of Park's actions for purposes of § 60-3701.

[6] The word "defendants" in this section means Hall, Schmidt, and Hamilton.

or refused Ducharme medical care in violation of the Eight Amendment and that they are entitled to qualified immunity. In response, plaintiffs argue Schmidt and Hamilton were deliberately indifferent to Ducharme's medical needs which caused her substantial harm. Plaintiffs have sued defendants in their personal and official capacities. The court will analyze the individual capacity claims in this section, however, the official capacity claims against these defendants "is essentially another way of pleading an action against the county or municipality they represent." *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010). Thus, the official capacity claims are actually claims against the Board of County Commissioners of Butler County, and will be analyzed in Section C.[7]

### 1. Eighth Amendment Claim: Deprivation of Medical Care

Plaintiffs argue defendants subjected Ducharme to cruel and unusual punishment in violation of the Eighth Amendment by delaying and denying her medical care.[8] Ducharme was a pretrial detainee at the time the claims arose. "'Pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment, [and] this Court applies an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983.'" *Barron v. Macy*, 268 Fed. App'x 800, 801 (10th Cir. 2008) (quoting *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002)). Plaintiffs make clear they are not arguing defendants should have substituted their judgment in place of the medical providers' judgment, rather plaintiffs argue the violation lies in refusing to forward Ducharme's requests for treatment, ignoring her serious health condition, and refusing to listen to

---

[7]Defendants argue, based on *Berry v. City of Muskogee, Okla.*, that the proper plaintiff in this action is Ducharme's estate rather through a special administrator. 900 F.2d 1489 (1990). Because the court determines the plaintiffs' claims must fail, it is unnecessary to consider whether Rogers is a proper plaintiff.

[8]Plaintiffs' Eighth Amendment claim of cruel and unusual punishment is made applicable to the states by the 14th Amendment, through § 1983. *See Estelle v. Gamble*, 429 U.S. 97, 101 (1976).

other inmates requests that she receive medical care.

First, it is necessary to determine the nature of the constitutional right at issue. "Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quotations omitted). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under s 1983." *Id.* at 104-05 (internal citations omitted). An inadvertent failure to provide adequate medical care does not constitute a constitutional violation. *Id.* at 105; *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).

The test for deliberate indifference is both objective and subjective. *Martinez*, 563 F.3d at 1088. "The objective component of the test is met if the 'harm suffered rises to a level sufficiently serious to be cognizable under the Cruel and Unusual Punishment Clause' of the Eighth Amendment." *Id.* (quoting *Mata v. Saiz*, 427 F.3d 745, 752-53 (10th Cir. 2005)). It is the harm claimed by the prisoner that must be sufficiently serious to satisfy this component, not solely symptoms present at the time the prison employee has contact with the prisoner. *Id.* Defendants do not challenge that the objective component has been met. It is clear Ducharme had a sufficiently serious medical need. Thus, this element is satisfied. Defendants contend plaintiffs cannot prove the subjective component of deliberate indifference.

"To prevail on the subjective component, the prisoner must show that the defendants 'knew [s]he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable

measures to abate it.'" *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006) (quoting

*Kikumura v. Osagie*, 461 F.3d 1269, 1293 (10th Cir. 2006)). "[A] prison official cannot be found

liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless

the official knows of and disregards an excessive risk to inmate health or safety; the official must

both be aware of facts from which the inference could be drawn that a substantial risk of serious

harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Essentially, deliberate indifference is the equivalent of recklessly disregarding a substantial risk of

serious harm. *Id.* at 836 ("It is, indeed, fair to say that acting or failing to act with deliberate

indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly

disregarding that risk."). However, "an official's failure to alleviate a significant risk that he should

have perceived but did not, while no cause for commendation, cannot under our cases be condemned

as the infliction of punishment." *Id.* at 838. Unlike the objective component, the symptoms displayed

by the prisoner are relevant to the subjective component of deliberate indifference. *Martinez*, 563

F.3d at 1089. "The question is: 'were the symptoms such that a prison employee knew the risk to the

prisoner and chose (recklessly) to disregard it?'" *Id.* (quoting *Mata*, 427 F.3d at 753). Circumstantial

evidence is sufficient to establish a prison official knew of the substantial risk of harm. *Id.*

"However, the Supreme Court has cautioned that an obvious risk cannot conclusively establish an

inference that the official subjectively knew of the substantial risk of harm, because 'a prison official

may show that the obvious escaped him.'" *Id.* (quoting *Farmer*, 511 U.S. at 843 n.8). Lastly, the

subjective component requires the prison official to disregard the specific risk of harm claimed by

the prisoner, not just the general risk of serious harm. *Id.* at 1089-90 (citing *Estate of Hocker v.*

*Walsh*, 22 F.3d 995, 1000 (10th Cir. 1994)) (holding plaintiffs were required to show defendants

were deliberately indifferent to prisoners specific risk of suicide (cause of death) not merely the risks of intoxication (symptoms prisoner exhibited)).

Furthermore, in order to prove a constitutional claim alleging a delay in providing medical care, plaintiff must show deliberate indifference resulting in substantial harm. *Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993); *see also Murnahan v. Does*, No. 11-3037, 2011 WL 1402826, at *4 (D. Kan. Apr. 13, 2011) ("In situations where treatment was delayed rather than denied altogether, the Tenth Circuit requires a showing that the inmate suffered 'substantial harm' as a result of the delay.") (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001); *Kikumura*, 461 F.3d at 1292).

Defendants contend there is no issue of material fact regarding the subjective component of deliberate indifference and that the only conclusion to be drawn from the facts is that they were not deliberately indifferent. The court will analyze each defendant separately.

### 2. Deputy Schmidt's Shift

There is no evidence showing Deputy Schmidt was deliberately indifferent to Ducharme's serious medical need during his shift. First, Ducharme was seen by the medical staff during the early part of his shift on June 25. Schmidt did not delay in getting Ducharme to her appointment and even provided her a wheelchair in order to get to the medical clinic. Later in Schmidt's shift, he observed Ducharme walking with a limp at times and even saw her fall. By his own admission, he could tell she was not feeling well, but he testified he never believed she was at risk of serious harm or that her condition required emergency attention. As plaintiffs acknowledge, Schmidt believed Ducharme was "faking" and was not really suffering from a serious medical condition. That Schmidt actually did believe she was faking, undercuts plaintiffs' contention that he was aware of a substantial risk of

harm and consciously or recklessly disregarded that risk. Further, it cannot be said that Schmidt was aware of symptoms of serious harm and recklessly disregarded them. Ducharme's symptoms during Schmidt's shift consisted primarily of walking with a limp, complaining of leg pain, falling down once, and needing a wheelchair to get to medical. However, Ducharme was responsive and conversed with Schmidt without issue. Even if Schmidt was generally aware plaintiff was suffering from a serious medical condition, there are no facts suggesting he knew or recklessly disregarded the risk that Ducharme had MRSA. Schmidt had limited training in communicable diseases such as MRSA, but was not trained to diagnose it. There simply are no facts suggesting Schmidt was aware Ducharme had MRSA or faced a serious risk of harm. Or that he actually drew that inference. It is true that Schmidt did not treat Ducharme in the most cordial way during his shift, and often castigated her and accused her of faking. Nevertheless, his rude behavior, while unprofessional and unfortunate, cannot establish constitutional liability for denying or delaying medical care. Taken as a whole, Schmidt's actions or inactions involving Ducharme present only a potential case of negligence. The facts, however, do not rise to the level of recklessness under the deliberate indifference standard. Thus, Schmidt is entitled to summary judgment on plaintiffs' § 1983 claim.

### 3. Deputy Hamilton

The facts surrounding Hamilton's interactions with Ducharme present a closer case, but ultimately fall short of establishing sufficient facts to support deliberate indifference. Essentially, plaintiffs' contend Hamilton violated Ducharme's right to adequate medical care by not contacting medical staff soon enough, or that he delayed, such that his conduct was deliberately indifferent. While it is quite possible Hamilton's conduct constituted negligence, he did not recklessly disregard

a substantial risk of serious harm.

Hamilton began his shift at 6:00 p.m. on the night Ducharme died. He immediately saw her fall in the women's dorm and believed she had faked the fall. According to the testimony of other inmates, Ducharme begged and pleaded with him that she needed help and believed she was dying. He called his supervisor, Sergeant Jackson, and told him Ducharme had fallen and asked what he should do. Park informed Jackson she had seen Ducharme twice that day and that she was fine. Jackson relayed that information to Hamilton. Around 6:30 p.m., Hamilton allowed other inmates to help bathe Ducharme because she was not able to stand up on her own. After returning to her bunk at 7:20 p.m. Ducharme fell out of her bunk, and Hamilton helped her back in bed. Again she pleaded with him that she needed help and that she was dying. At this point, or not long thereafter, Hamilton again contacted Jackson, who was in the medical clinic, and told him he thought Ducharme needed follow-up care. After informing Park, Jackson relayed back to Hamilton they would contact Harper. Minutes later he saw Ducharme's legs and fingers turning purple and immediately called medical again and was advised to escort Ducharme to the medical clinic.

The question determining Hamilton's liability is whether his delay in requesting medical care constituted reckless disregard of a substantial risk of harm. Delaying medical care may support a constitutional violation in some circumstances, but it does not here. *See Olson v. Stotts*, 9 F.3d 1474, 1477 (10th Cir. 1993) ("'[D]elay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference which results in substantial harm.'") (quoting *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993)).

Once Hamilton arrived on duty and observed Ducharme's condition, he delayed in contacting the medical clinic for about an hour and thirty to forty-five minutes. However, during that time, he

did not totally disregard Ducharme's condition. He contacted his supervisor after she fell to determine if he should do anything. Then, after Ducharme fell from her bunk and pleaded with him for medical help he contacted his supervisor who was in the medical clinic. Minutes later he again contacted medical when her feet and hands began turning purple. Plaintiffs point to two facts in arguing for Hamilton's liability: (1) Ducharme's fall when he came on duty and (2) witnessing other inmates shower Ducharme because she was unable to do so herself. Those two events, although closer to indicating a serious need for medical assistance, do not establish that Hamilton acted recklessly in failing to contact medical services for her immediately. In fact, plaintiffs agree Hamilton believed Ducharme was faking. Plaintiffs contend Hamilton should have recognized, based on seeing Ducharme's fall and inability to shower that she needed immediate medical care. Such a "should have" argument only supports Hamilton's possible negligence in failing to act. That he did not act immediately after those two events does not constitute the recklessness needed for deliberate indifference. *See Farmer*, 511 U.S. at 538 (stating "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment").

Clearly Ducharme was seriously ill by the time Hamilton arrived at the women's dorm. But, her symptoms and physical condition were not "obviously serious" so as to constitute recklessness. Hamilton was not trained to detect MRSA, and plaintiffs provide no facts that he was aware plaintiff was suffering from MRSA. Had Hamilton delayed further before contacting the medical clinic, especially after observing her hands and feet turning purple, plaintiffs may have been able to show deliberate indifference. Because Hamilton did act to ensure Ducharme received medical treatment, even though not immediately after observing her condition, he acted reasonably, sufficient to avoid

constitutional liability. *See Farmer*, 511 U.S. at 844 ("In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if harm ultimately was not averted."). Thus, Hamilton is entitled to summary judgment on plaintiff's § 1983 claim against him.

### 4. Deputy Hall

Plaintiffs make no argument in their Response that Hall's actions constitute deliberate indifference or that his actions or inaction caused Ducharme's death. The uncontroverted facts confirm plaintiffs cannot establish such a claim against Hall. Hall started his shift at 6:00 p.m. on June 24. Ducharme complained of leg pain, and Hall promptly provided her a medical request form and instructed her to complete it. After she did, Corporal Lovette brought Ducharme to the medical clinic, and she was examined by Park. After returning from the clinic, Ducharme made several complaints to Hall about leg pain and headaches, but no evidence suggests he was aware of a serious medical condition. Therefore, because plaintiffs cannot show Hall acted with deliberate indifference or caused Ducharme's death, he is entitled to summary judgment on plaintiffs' § 1983 claims.

### 5. Qualified Immunity

Defendants further argue they are entitled to qualified immunity from liability because their conduct did not violate a clearly established right. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982)). When determining whether an individual is entitled to qualified immunity, the court must determine (1) whether the plaintiff has alleged a violation of a constitutional right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct. *Id.* at 815-16. After a defendant asserts a claim of qualified immunity, "'the plaintiff has the heavy burden of establishing: (1) that the defendant's actions violated a federal constitutional or statutory right; and (2) that the right violated was clearly established at the time of the defendant's actions." *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1196 (10th Cir. 2010) (quoting *Scott v. Hern*, 216 F.3d 891, 910 (10th Cir. 2000)). However, this court will review the evidence in the light most favorable to the plaintiff. *See Fletcher v. Burkhalter*, 605 F.3d 1091, 1096 (10th Cir. 2010).

As analyzed above, plaintiffs have failed to present sufficient evidence establishing that defendants violated Ducharme's right to medical care, thus, defendants are also entitled to qualified immunity.

### C. Defendants Board of County Commissioners of Butler County and Sheriff Craig Murphy's Motion for Summary Judgment (Dkt. No. 134)

In this motion, defendants[9] contend they are entitled to qualified immunity on all of plaintiffs' § 1983 claims—inadequate training, deficient policies or customs, and inadequate supervision. In their Response, plaintiffs argue (1) defendants inadequately supervised the female inmates at the Butler County Jail through a policy decision which denied Ducharme her right to adequate medical care, and (2) that defendants failed to supervise Deputy Schmidt (or should not have retained him). Plaintiffs do not pursue an inadequate training theory; thus, this court will not address it. The official

---

[9] In this section, "defendants" means the Board of County Commissioners of Butler County and Sheriff Craig Murphy.

capacity claims against Sheriff Murphy are more appropriately characterized as claims against the county and will be analyzed accordingly. *See Porro*, 624 F.3d at 1328. Additionally, plaintiffs also sued defendants Hall, Schmidt, and Hamilton in their official capacities alleging a deprivation of medical care. This is actually a claim against the county, which the court will now analyze.

### 1. Supervision of Ducharme and Her Right to Adequate Medical Care

The Tenth Circuit has held that a county or sheriff (in his official capacity) cannot be held liable for constitutional violations if there is no underlying constitutional violations by any of its officers. *Martinez*, 563 F.3d at 1091 (citing *Olsen*, 312 F.3d at 1317-18). Even if, as plaintiffs argue, defendants supervision of Hall, Schmidt, or Hamilton was unconstitutional, neither Sheriff Murphy nor the Board of County Commissioners may be held liable when, as here, the individual officers did not commit a constitutional violation. *See id.* ("[E]ven if, as Martinez argues, the policies, training, and supervision [of the individual county defendants] were unconstitutional, the [county] cannot be held liable where, as here, the officers did not commit a constitutional violation.") (citations and quotations omitted).

Similarly, Sheriff Murphy may not be held liable in his individual capacity for implementing or setting county policy regarding supervision or for the actions of the individual officers under a supervisory liability theory, when there was no underlying violation of Ducharme's constitutional rights. *See id.* at 1092. Because the court concludes the individual officers (Hall, Schmidt, and Hamilton) did not violate Ducharme's constitutional rights, Sheriff Murphy and the Board of County Commissioners cannot be held liable as a matter of law, and defendants are entitled to summary judgment on this claim.

2. Supervision and Retention of Deputy Schmidt

Last, plaintiffs argue the Board of County Commissioners and Sheriff Murphy are liable for inadequately supervising and retaining Schmidt. As explained above, because no individual officer defendant is liable, neither the county nor Sheriff Murphy can be liable on this claim. *See, e.g.*, *Olsen*, 312 F.3d at 1317-18 ("We will not hold a municipality liable [for constitutional violations] when there was no underlying constitutional violation by any of its officers." (internal quotation marks omitted)). Thus, defendants are entitled to summary judgment on this claim.

## IV. Remaining State Law Claims

The only remaining claims against all defendants are state law claims of wrongful death, survival, and negligence. Defendants Board of County Commissioners, Sheriff Murphy, Hall, Schmidt, and Hamilton move this court to dismiss these remaining claims against them without prejudice. In this situation, the court has discretion to either exercise or decline to exercise jurisdiction over pendent state law claims. *See* 28 U.S.C. § 1367(c) (2006) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—the district court has dismissed all claims over which it has original jurisdiction."). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). However, at this stage in the litigation, most of the factors favor exercising jurisdiction over plaintiffs' state law claims. This case is nearly two years old, discovery has concluded, and this court is familiar with the issues. The principle of comity, while

important, does not justify shuttling this case from federal to state court at this juncture. *See Dodson Aviation, Inc. v. Padron*, No. 10-4036, 2011 WL 1097774, at *20 (D. Kan. Mar. 22, 2011).

IT IS ACCORDINGLY ORDERED this 1st day of June, 2011, that defendant El Dorado Internal Medicine, L.L.C.'s Motion for Summary Judgment on Plaintiffs' Claim for Punitive Damages (Dkt. No. 130) is granted.

IT IS FURTHER ORDERED that defendants Aaron Hall, Michael Schmidt, and Steve Hamilton's Motion for Summary Judgment (Dkt. No. 135) is granted.

IT IS FURTHER ORDERED that defendants Board of County Commissioners of Butler County, Kansas and Sheriff Craig Murphy's Motion for Summary Judgment (Dkt. No. 133) is granted.

IT IS FURTHER ORDERED that this court will exercise supplemental jurisdiction over plaintiffs' remaining state law claims and defendants request to dismiss these claims is denied.


s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE